IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBISON FARMS, INC.,                )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )        Case No.  05-4089-KGS
                                    )
ADM ALLIANCE NUTRITION, INC.,       )
and AGRESEARCH, INC.,               )
                                    )
                    Defendants.     )

## MEMORANDUM AND ORDER

This matter comes before the court upon defendants' Motion for Summary Judgment (Doc. 69).

Plaintiff has filed a response (Doc. 74) to which defendants have filed a reply (Doc. 83).  Also pending

before the court is defendants' Joint Motion to Exclude the Opinions and Testimony of Plaintiff's Expert

Bruce E. Plashko, PhD Relating to Possible Product Contamination (Doc. 68).    Plaintiff has filed a

response (Doc. 77) to which defendants have filed a reply (Doc. 81).  The issues are fully briefed and ripe

for decision.  As detailed below, the court grants defendants' Motion to Exclude Dr. Bruce Plashko's

Testimony and grants defendants' Motion for Summary Judgment.[1]

## I.   Joint Motion to Exclude Opinions and Testimony of Plaintiff's Expert, Bruce E. Plashko, Ph.D.

The court, in its function as a gatekeeper, finds Dr. Plashko's opinion testimony inadmissible.

### A.   Background

Dr. Plashko is a published organic chemist who received a B.S. in chemistry, M.S. in organic

chemistry, and Ph.D. in organic chemistry.[2]  He is currently the Vice President of Technical Services for

_____

[1]As to both motions, the court has considered all of the arguments presented by the parties,
although they are not all discussed herein.

[2] Plaintiff's Initial Disclosures of Expert Witnesses (Doc. 34).

NutriShield, Inc., in Lawrenceburg, Indiana, where he works on the development of food preservatives, including propionate based systems.[3]  Propionic acid is the main active ingredient in the Super Hay product, which is manufactured and distributed by defendants AGresearch and ADM, respectively.[4]

Dr. Plashko's initial expert report provides in part as follows:

> The purpose of this report is to provide *possible* theories as to why Super Hay failed when used by Robison Farms, Inc.
> . . .
> Initially, one could explain such a failure on the "improper application" of the product to the hay by Robison Farms.  Three facts, however, would argue against this.  First, the Robisons are experienced farmers, knowledgeable in the application of such products to hay, having used a competitor's innoculant product for several years prior to the problems experienced with "Super Hay."  Second, when the Robisons switched back to the same product they used prior to using "Super Hay" after they experienced the problems that resulted in the lawsuit, the results were favorable.  Third, a neighboring farm operation, who is also experienced with such products, and who shared a portion of the tank truck loads in question, had similarly poor results using the delivered "Super Hay" and successful results with competitor's products.
>
> One explanation that is *plausible* for the failure of the "Super Hay" product delivered to Robisons is the lack of quality control on the part of the manufacturer, Agresearch, to ensure that the concentration of the major active ingredient, propionic acid, was, in fact, as put forth on the label.
> . . .
> A second *plausible* explanation for the failure of the "Super Hay" to function as advertised would be if there were a contaminant present in the delivery truck's tank that reacted with the "Super Hay" solution and thereby lowered the effective concentration of the active ingredient, propionic acid.  Again *if* this happened, the farmer would unknowingly be applying a lower amount of the active ingredient to the hay than he thought, resulting in inadequate preservation of the hay.
>
> This explanation becomes all the more *plausible* when one considers the fact that Agresearch itself reported the presence of a "molasses like" material being present in a delivery hose on one of the trucks used to transport the Super Hay. . . .  This coupled with the fact that the active ingredient *could potentially* react with the sugar in molasses to lower the propionic acid's concentration.  *If* enough residual molasses were present in the truck's

---

[3] *Id.*

[4] Memorandum in Support of Motion to Exclude (Doc.  70) at (Exhibit B) (Dr. Plashko Depo.).

tank it could *possibly* react with sufficient amounts of propionic acid to make the altered "Super Hay's" use ineffective.

. . .

I may *change* or *add* to my report once additional information is developed.[5]

The communication Dr. Plashko reference regarding "molasses" is an internal memo of AGresearch and provides, in part:

8/13/03 Bulk truck load was rec'd back from NCK/Robinsons [sic] Farms. The tanker arrived for unloading and was sent to the scales for gross weight.

After returning, he started to hook up his 3" hose for unloading. Upon inspection of his hose, it was found to be contaminated with what looked like molasses. His hose was rejected and an AGresearch hose was used. Further inspection revealed that the 3" nipple elbow and male hose coupler, and from outbound valve forward was also contaminated with molasses. It was rinsed out before unloading.

. . . .

NCK

The truck driver said that 2500 gallon (approx) came from one tank and 500 gallons from another (QLF tank). Driver also said that the hoses were laying on the ground with no end caps. They had three people tilt the tank so that the total contents could be emptied. . . . A sample was taken from the bottom of the compartment and it contained a large amount of dirt, asphalt, and rocks. A sample taken from load is also being sent to Midwest Labs for analysis of organic acid level.

Largest amount of contaminate was found in product from NKC Feeds.

. . . .

Robinsons [sic]:

All product was pumped from one tank. Driver said that hoses were laying on the ground with no end caps as well. A sample was taken from the bottom of the compartment and it contained what appeared to be asphalt, dirt, and rocks. A sample taken from load is also being sent to Midwest Labs for analysis of organic acid level.[6]

Dr. Plashko's report concludes that "a complete analysis of the Super Hay product delivered to the Robisons *cannot be* provided until additional information is provided by Agresearch [sic]" namely:

---

[5]*See* Supplemental Disclosure of Expert Witness (Doc. 40); Exhibits in Support of Response (Doc. 78) at (Exhibit 16)(emphasis added).

[6]Memorandum in Support of Motion to Exclude (Doc. 70) at (Exhibit C).

1.   Certificates of Analysis of the "Super Hay" from the manufacturer, Agresearch, detailing the exact concentrations of the active ingredients in the particular lots delivered to Robison Farms.

2.   Detailed records from the trucking firm that made the deliveries of the "Super Hay" product to Robison Farms indicating (1) what other chemicals were present in the truck's tanks from prior deliveries and (2) what cleaning, if any, had been done to the inside of the truck's tanks to assure that any previous materials had been completely removed prior to loading the "Super Hay" solution.

3.   Results from an independent laboratory of the analysis of a sample of the "Super Hay" delivered to Robison Farms.  Such a sample was delivered to a representative of Agresearch from Robison with no apparent action being taken to accomplish such an analysis.[7]

Defendants contend that there is no evidence that Dr. Plashko ever received this additional information, and plaintiff does not dispute this point.

On May 30, 2006, Dr. Plashko sent plaintiff's counsel a letter wherein he noted "Examination of the data forwarded to us has revealed an interesting fact.  On four different truck loads the amount of material delivered by the trucker was considerably greater than that loaded into the truck by AGresearch. This would mean that, for example with the June 2003 load, that over 3 tons (or almost 15% of the entire load) consisted of some unknown substance that was delivered to Robison Farms along with the 'Super Hay' that had been ordered."[8]  This letter to plaintiff's counsel also informed that "preliminary analysis did not indicate what that unknown substance or substances might be.  However, it is difficult to imagine that when you have close to 15% of some foreign material in with the supposedly pure 'Super Hay' that it wouldn't affect its ultimate efficacy in terms of hay preservation in some manner."[9]  On June 5, 2006, plaintiff's counsel submitted to defendants what she titled "Supplemental expert reports" wherein Dr.

---

[7]See Exhibits in Support of Response (Doc. 78) at (Exhibit 16)(emphasis added).

[8]Memorandum in Support of Motion to Exclude (Doc. 70)at (Exhibit D).

[9]*Id.*

Plashko identified the loads he previously had  mentioned in his memo using data given to him by defendant AGresearch.[10]

### B.    Standard

Federal Rule of Evidence 702 governs expert testimony.  Rule 702 states:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[11]

The court has broad discretion in deciding the admissibility of expert testimony.[12]  Under Fed. R. Evid. 702, the trial court must act as a gatekeeper and determine at the outset, pursuant to Fed. R. Evid. 104(a), whether the expert's testimony is admissible.[13]  Determining the admissibility of an expert's testimony requires a two-part inquiry.  First, the court must determine whether the expert is qualified by "knowledge, skill, experience, training or education" to render an opinion."[14]  The relevant inquiry as to the expert's qualification asks whether the opinion falls "within the reasonable confines" of the expert's subject area."[15]

---

[10]*See* (Doc. 80) (Exhibit 18).

[11]Fed. R. Evid. 702.

[12]*See Moses v. Halstead*, 477 F. Supp.2d 1119, 1123 (D. Kan. 2007).

[13]*Allenbrand v. Louisville Ladder Group.,* No. 05-2511-KHV, 2007 U.S. Dist. LEXIS 2400 at *9 (D. Kan. Jan 11, 2007) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)).

[14]*Hold v. Wesley Med. Center*, No. 00-1318-JAR, 2004 U.S. Dist. LEXIS 13814 (D. Kan.  19, 2004).

[15] *Id.* (citing *Burton v. RJ Reynolds Tobacco Co.*, 183 F.Supp.2d 1308, 1313-14 (D. Kan. 2002)).

Second, if the expert is qualified, the court must consider whether his opinions were "reliable" as set forth under the principles of *Daubert* and *Kumho Tire* and relevant.[16]   The *Daubert* court listed four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance.[17]   However, the court in *Kumho Tire* emphasized that these four factors did not constitute a "definitive checklist or test" and that a court's reliability inquiry "depends upon the particular circumstances of the particular case."[18]

Generally, an analysis of reliability applies to *all* aspects of the expert's testimony "including the *facts underlying the opinion*, the methodology, and the link *between* the facts and the conclusion drawn."[19] Consequently, the court must make a flexible, practical analysis of the reliability of the testimony considering factors relevant to the case such that it ensures the expert's testimony, based on scientific, technical, or other specialized knowledge, comes from a reliable foundation, and is relevant to the task at issue.[20]

---

[16]*Id.* at *10 (citing *Ralston v. Smith & Nephew Richards, Inc*., 275 F.3d 965, 969 (10th Cir. 2001))(emphasis added).

[17]*Lohmann & Rauscher, Inc. v. K.K. (U.S.A.) Inc*., 477 F. Supp. 2d 1147, 1158 (D. Kan. 2007) (citing *Daubert*, 509 U.S. at 597).

[18]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

[19]*Hold*, 2004 U.S. Dist. LEXIS 13814 at *10 (citing *Heller v. Shaw Indust., Inc*., 167 F.3d 146, 155 (3d Cir. 1999))(emphasis added).

[20] *See e.g., Kumho Tire*, 526 U.S. at 141 (adding that the standard of admissibility set forth in *Daubert*, applies to testimony based on "technical," and "other specialized" knowledge, in addition to "scientific" knowledge.  The court added that a distinction need not be made between the three because there is no clear line dividing one from another).

As part of the gatekeeping function, the trial court must determine whether the expert opinion is based on facts that enable the expert to express a *reasonably accurate conclusion* as opposed to conjecture or speculation, yet absolute certainty is not required.[21]  "Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion."[22]  "Scientific evidence and expert testimony must have a traceable, analytical basis and objective fact before it may be considered on summary judgment."[23]  Even though experts commonly extrapolate from existing data neither *Daubert* nor the Federal Rules of Evidence "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[24]  Regardless of the specific *Daubert* factor at issue, the relevant inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[25]

---

[21] *Allenbrand*, 2007 U.S. Dist. LEXIS 2400 at *12 (citing *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988))).

[22] *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005)(citation omitted).

[23] *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

[24] *Joiner*, 522 U.S. at 146.

[25] *Allenbrand*, 2007 U.S. Dist. LEXIS 2400 at *12 (citing *Kumho Tire*, 526 U.S. at 152).

## C.      Discussion

Defendants argue, and the court agrees, that Dr. Plashko's opinions and testimony should be excluded because they amount to mere conjecture and speculation and are not founded on facts that enable him to express a reasonably accurate conclusion.

### 1.      Testimony regarding propionic acid levels

First, defendants note that Dr. Plashko's testing revealed that propionic acid was present at levels at or above advertised percentages, and Dr. Plashko thus concluded that low-propionic acid levels at the design level were "probably not the cause of the failure."[26]  In fact Dr. Plashko detected no design defect in the Super Hay product at all.  Defendants do not dispute this part of Dr. Plashko's testimony.

### 2.      Dr. Plashko's ruling out of plaintiff's misapplication of the Super Hay product

Defendants dispute Dr. Plashko's ruling out the possibility that plaintiff misapplied the Super Hay product.  By his own admission Dr. Plashko is not an expert as to the proper curing and bailing of hay.[27]  Furthermore, Dr. Plashko admitted that "[e]verything [he] [knew] about what Robison Farms did with the Super Hay product is what [he had] been told by [plaintiff's counsel]."[28]  Similarly, Dr. Plashko also ruled out plaintiff's misapplication of Super Hay as a cause for plaintiff's hay going out of condition because he had been informed that another farm had a similar problem with its hay when using the same batch of Super Hay.  Here, as Dr. Plashko readily admitted, the court finds the reliability of plaintiff's haying practices falls well outside of Dr. Plashko's area of expertise–organic chemistry.  Thus, the court finds any testimony from Dr. Plashko ruling out plaintiff's misapplication of the Super Hay product would be

---

[26]Memorandum in Support of Motion to Exclude (Doc. 70) at (Exhibit B) at p. 12.

[27]*Id.* at (Exhibit B) p. 63.

[28]*Id.*

inadmissable because his opinion falls outside "the reasonable confines" of the subject area of his expertise.[29]

### 3. Dr. Plashko's conclusion that the Super Hay used by plaintiff was contaminated

Similarly, the court finds Dr. Plashko's conclusion that the Super Hay product used by plaintiff was contaminated such that it caused plaintiff's hay to go out of condition is inadmissible.

In the instant motion defendants contend Dr. Plashko's assessment that nearly three tons of some sort of "contaminant" was contained in the Super Hay load to plaintiff failed to take into account that "AGresearch added Super Hay from stock in its warehouse to its batch amounts to maximize the Super Hay loads bound from plaintiff, a maximization that was requested by plaintiff itself to reduce transportation costs."[30] As to Dr. Plashko's proposition that the Super Hay plaintiff used contained "15% of some foreign material" the court concludes that "there is simply too great an analytical gap between [this] data" and the opinion proffered by Dr. Plashko. While the records that a weight discrepancy existed between the trucking loads could be admissible, Dr. Plashko's *conclusion* that this discrepancy amounts to a 15% *contamination* of the Super Hay product is an impermissible leap in judgment. This leap appears especially broad in light of Dr. Plashko's statement that he could not provide "a complete analysis of the Super Hay product delivered to the Robisons" without further information he apparently never received.

In response to the instant motion, plaintiff asks, at a minimum, that the court to allow Dr. Plashko to testify regarding certain chemical interactions. During his deposition Dr. Plashko explained how

---

[29]*Hold v. Wesley Med. Center*, No. 00-1318-JAR, 2004 U.S. Dist. LEXIS 13814 (D. Kan. July 19, 2004).

[30]Memorandum in Support of Motion to Exclude (Doc. 70) at p. 7 (citing (Exhibit E) (affidavit of Tim Broadway, operations manager for AGresearch)).

various products such as alcohol, sugars and amines would react with Super Hay's active ingredients.[31] Specifically, plaintiff notes that Dr. Plashko gave a "scientific explanation of how the propionic acid in Super Hay would react with a sugar-based product" and because "[d]efendants have not challenged any of these scientific techniques, . . . the court should therefore presume that they are scientifically based and reliable."[32]

Plaintiff contends because no sample of the Super Hay product used at its farm is available, Dr. Plashko must base his opinion on the evidence available to him. Plaintiff states that such evidence is (1) the internal memo from AGresearch indicating that a hose attached to a truck that returned the Super Hay to AGresearch was "contaminated with what looked like molasses"; (2) that the same batch of Super Hay was also delivered to another farm whose hay also went out of condition; and (3) both Doyle and Delton Robison have stated that the Super Hay product delivered to plaintiff contained a foreign substance that resembled sugar granules.[33] Plaintiff contends that this evidence is sufficient for Dr. Plashko to testify regarding how a molasses or sugar-like substance would react with the Super Hay product. While that might be true, the court finds this evidence is not sufficient for Dr. Plashko to conclude that some sort of contamination caused plaintiff's hay to go out of condition.

Dr. Plashko testified that a sugar-type product, such as molasses, could react with propionic acid, presumably lowering the effect of the active ingredient in the Super Hay in some manner; alcohols and amines could also react with the acid to cause the propionic acid to lose its ability to preserve. However, Dr. Plashko did not conduct any tests because he did not know what the molasses or sugar-like substance

---

[31]*Id.* at (Exhibit B) p. 38-45.

[32]*See* Memorandum in Support of Plaintiff's Response (Doc. 77) at (Attachment 1) at p. 5. Defendants do not directly refute this statement in their reply. *See e.g.*, Reply (Doc. 81).

[33]*Id.*

was, but stated that a sugar-based product could react with the propionic acid in Super Hay so that "a third product is produced. And that [third product] would not be expected to behave as a preservative."[34] Yet, Dr. Plashko's testimony regarding *how* this third product would decrease the efficacy of the Super Hay is speculative at best. Dr. Plashko's testified that he did not know what the contamination of plaintiff's Super Hay was, "[w]ithout having an actual sample to deal with, all we can do is conjecture with it on possibilities."[35] Likewise, Dr. Plashko did not know whether this unknown alleged "product" would have had any effect on the preservation of plaintiff's baled hay.[36] To that end Dr. Plashko testified in part, as follows:

> Q:    If this reaction occurred and a third product resulted, but the overall product still was above 70 percent propionic acid, would you expect it to have the same ability to preserve?
>
> A.    It would depend on the third product produced, if you will, or perhaps even the original –you know, if we're for example considering molasses. And the only reason we're doing that is that the trucker mentioned it. Besides its lowering the amount of available propionic acid, one *could* I *suppose* conceive that *might somehow* affect the application as well. But I have *no* direct knowledge of that.
>
> Q:    You've never heard of that occurring or seen any studies about that occurring?
>
> A.    No.
>
> Q:    So then to your understanding and to your experience, if you still had a product that was–had a high concentration of propionic acid, it would still have the same preservative qualities that it had prior to this interaction?
>
> A.    If the other material present did not interfere some way, and that's an unknown.
>
> Q:    If molasses interacted with propionic acid and created this third product, would it be a liquid product? Would it be crystalline? What would it be?
>
> A.    I–in my opinion, I do not know for sure. I believe it would be a solid-a solid product. The more pertinent question is would it dissolve the propionic acid, and I'm not sure of that.[37]

---

[34]Memorandum in Support of Motion to Exclude (Doc. 70) at (Exhibit B) p. 40.

[35] *Id.* at (Exhibit B) p. 20.

[36] *Id.* at (Exhibit B) p. 115-116.

[37]*Id.* at (Exhibit B) p. 42-43 (emphasis added).

Moreover, Dr. Plashko admitted that he did not how much of a containment or "third product" would be needed to decrease the efficacy of the Super Hay such that plaintiff's hay would go out of condition.[38] Dr. Plashko did not test for a carbohydrate level after the weight discrepancies were noted by him, thus no specific test was ever done to determine if a carbohydrate, such as molasses, was in the Super Hay product.[39] Dr. Plashko noted that his role in plaintiff's case was to "discover what the problem [with Super Hay] was" however, because "there is that missing element of having samples of truck residue, all one can do is provide *some possibilities*."[40]

Even if, as plaintiff suggests, the court were to permit Dr. Plashko to testify regarding the narrow issue of how a sugar-based product could react with an acid one, Dr. Plashko is unprepared to testify with *any* reasonable degree of scientific certainty as to how this would decrease the efficacy of Super Hay. Here, using its gatekeeping function, the court finds Dr. Plashko's opinion that contamination caused a decrease in the efficacy of the Super Hay such that plaintiff's hay went out of condition amounts to mere conjecture and speculation.[41]   Accordingly, defendant's motion to exclude Dr. Plashko's testimony is granted.

---

[38] *Id.* at (Exhibit B) p. 40-41.

[39] *Id.* at (Exhibit B)  p. 49.

[40]*Id.* at (Exhibit B) p. 116 (emphasis added).

[41]   *Allenbrand*, 2007 U.S. Dist. LEXIS 2400 at *12 (D. Kan. Jan 11, 2007)  (citing *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

## II.     Summary Judgment Motion

In the present motion, defendants seeks summary judgment on each of plaintiff's claims, namely plaintiff's claims of (1) negligent misrepresentation, (2) breach of warranty under the Kansas Uniform Commercial Code, specifically breach of express warranty, K.S.A. 84-2-313, breach of implied warranty of merchantability, K.S.A. 84-2-314, and breach of implied warranty of fitness for a particular purpose, K.S.A. 84-2-315, and (3) breach of contract.  As to all of plaintiff's claims, the court finds summary judgment warranted.

### A.     Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[42]  For purposes of reviewing a summary judgment motion, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[43]  A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[44]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[45]  Once the moving party satisfies this initial burden in a properly supported motion, the burden shifts to the non-moving party to show that genuine issues remain for trial "as to those dispositive

---

[42] Fed. R. Civ. P. 56(c).

[43] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[44] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson,* 477 U.S. at 248).

[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  *See also Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1195 (D. Kan. 2001); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991).

matters for which it carries the burden of proof."[46]  The non-moving party may not rest on mere allegations or denials in its response in opposition to summary judgment, but "must set forth specific facts showing that there is a genuine issue for trial."[47]

The court determines "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."[48]  To that end, the court "should not weigh the evidence or credibility of witnesses."[49]  On a motion for summary judgment, the "judge's function is not. . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[50]  The court must consider the record in the light most favorable to the non-moving party.[51]  "If an inference can be deduced from the facts that would allow the nonmovant to prevail, summary judgment is inappropriate."[52]

When deciding a summary judgment motion, the court may consider evidence submitted even if it would not be admissible at trial.  As the Tenth Circuit recently explained:

> Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.  Nonetheless, "the content or substance of the evidence must be admissible."  Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented

---

[46] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

[47] *Liberty Lobby*, 477 U.S. at 256.

[48] *Id.* at 251-52.

[49] *Wells v. Wal-Mart Stores, Inc.*, 219 F. Supp. 2d 1197, 1200 (D. Kan. 2002).

[50] *Liberty Lobby*, 477 U.S. at 249.

[51] See *Doebele*, 157 F. Supp.2d at 1195.  See also *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991).

[52] *Wells*, 219 F. Supp. 2d at 1200 (citing *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir. 1986)).

at trial in any form.  The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage.  To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.[53]

**B.     Factual Background**

The following facts are either uncontroverted or, if controverted, construed in the light most favorable to plaintiff, the non-moving party.  Immaterial facts and factual averments not properly supported by the record are omitted.

**1.     The Parties and Background**

Plaintiff Robison Farms, Inc. ("Robison Farms" or "plaintiff") is a corporation in Scandia, Kansas, whose principal business, since 1991, is the production and sale of alfalfa hay.  Brothers Delton and Doyle Robison co-own Robison Farms.  Defendant AGresearch, Inc. ("AGresearch") manufactures a hay preservative called "Super Hay."  Defendant ADM Alliance Nutrition, Inc. ("ADM" or AGresearch and ADM collectively "defendants") markets and sells the Super Hay product.  Propionic acid is the primary active ingredient in the Super Hay product and acts as a deterrent against mold growth.  When hay is cut, baled, stacked, and stored, moisture in the hay can cause mold, leading to deterioration in the quality and value of the hay (hay going "out of condition").  According to Dr. Anderson, plaintiff's retained expert, hay producers who bale hay at higher moisture levels: (1) often use hay preservatives to combat the moisture; and (2) should apply hay preserver at a rate corresponding to the highest moisture level within the bale to reduce mold growth in baled hay.  Dr. Anderson also contends that if a producer does not get

---

[53]*Coleman v. Blue Cross Blue Shield of Kansas*, 487 F. Supp. 2d 1225, 1232 (D. Kan. 2007)(citing *Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

an accurate reading of the moisture content of the hay throughout the bale, it will diminish the effectiveness of the preservative.

### 2.      Plaintiff's Decision to Use Super Hay.

#### a.      Plaintiff's 2002 use of Super Hay

In 2002, plaintiff used Super Hay on its hay for the last half of its fourth and all of the fifth cutting of hay.  Plaintiff switched from another preservative to the Super Hay preservative when Brian Larson, a local ADM dealer, introduced the Super Hay, a less expensive product, to plaintiff.  Plaintiff admits that there were no written representations, promises, or guarantees when it decided to purchase and use Super Hay.  Rather, plaintiff relied on the written label to determine rate instructions and the guaranteed analysis of the chemical composition of the product.

Plaintiff used Harvest Tec bailing equipment–a common type of moisture measuring device–to detect the moisture content of its hay as it is being baled.  In addition, in 2002 and 2003, plaintiff occasionally used a hand probe to detect surface moisture in stacked bales.  Despite placing the stacks in a pyramid fashion, which could allow more air flow, most of the 2002 fifth cutting went out of condition after the Super Hay was applied to the bales.  Plaintiff sent the moisture sensor computers on the bales to Harvest Tec to clarify that nothing was wrong with plaintiff's equipment.

After the 2002 haying season and prior to the 2003 haying season, plaintiff had asphalt pads built, which held the majority of its hay. The pads are elevated above normal ground approximately six inches, in an attempt to ensure that no moisture would exist underneath the baled and stored haystacks.

#### b.      Early April 2003 meeting with defendants' representatives

Two representatives of ADM, Mark Stephens, and Barney Rapp (the local North Central Kansas dealer), were aware of the problems with plaintiff's 2002 cutting in late November or early December

2002.  Mr. Larson, Mr. Stephens, and Kim Johnson, a representative of Agresearch, met with plaintiff in early April 2003.  Plaintiff claims Mr. Stephens stated at the meeting that ADM would guarantee Super Hay would work, he would "take care" of the Robisons if the product didn't work as it had failed in 2002, and would give plaintiff a discounted price for Super Hay for the 2003 growing season.   Plaintiff also contends Mr. Stephens and Mr. Johnson were aware of its farming practices at the meeting, and represented that Super Hay would work with its current farming operation.   Plaintiff contends that based on the guarantees made by Mr. Stephens and Mr. Johnson, plaintiff again ordered the Super Hay product.

### 3.        Plaintiff's haying practices

Plaintiff's regular practice was to rake its cut hay only one time, which it did for the first 2003 cutting. According to Dr. Kevin Shinners, retained by Plaintiff as a rebuttal expert witness, raking only once is sufficient because of the more arid Kansas climate experienced at Robison Farms, and because multiple rakings causes excessive leaf loss, which reduces the value of bales to dairy producers.

Dr. Shinners also testified that it is unusual for alfalfa  producers to bale hay only 24 hours after cutting because proper baling moisture is not always achieved after 48 hours.  In 2003, plaintiff baled its hay less than 24 hours after it was raked.  However, plaintiff's hay was dried down 3-5 days after cutting the hay and prior to the hay being raked.  Thus, plaintiff contends it was appropriate for the hay to be raked once, after drying down 3-5 days, and baled within 24 hours after raking.  Plaintiff makes its bales in a 4' x 4' x 8' size, at a standard weight of 2,000 pounds.

The Super Hay label instructed that large squares bales should be stacked with four to six inches of space between the bales.  In 2003, plaintiff used the "Haying Mantis" machine to stack hay bales to save on time and manpower.  The bales were placed in stacks of eight bales that were four bales high (a cube); and between each eight-bale cube there was a gap of four to six inches. Each row of hay was one bale wide

and between 60 to 70 feet apart from each other.  Plaintiff contends this is a conventional, widespread method of stacking bales that leaves three sides of the bales open to ventilation.

### a.    Plaintiff's 2003 first cutting use of Super Hay

In April 2003, before the first cutting, defendants claim that they warned plaintiff, in writing, (1) to affirmatively check the content of the moisture of the hay in order to apply the correct amount of Super Hay, (2) to not stack its hay four bales high for at least 25 days, and (3) that "there are too many variables in hay storage to make any guarantees on the use of Super Hay."  However, plaintiff claims that it never received a copy of this letter until defendants produced it in discovery. Thus, plaintiff contends it only continued using Super Hay in 2003 because of the guarantees made by the defendants and the substantial discount promised to the plaintiff because of the problems that occurred in 2002.

Plaintiff began its 2003 first cutting on May 27, and began its second cutting on June 26.  After the first cutting had been baled and prior to noticing any mold in the stacks, Mr. Johnson toured some of plaintiff's fields, and did not express any concerns as to the plaintiff's haying practices.  After visiting Robison Farms, Mr. Johnson sent a letter to plaintiff dated June 15, 2003, wherein he made no criticisms about plaintiff's farming practices, but complimented the building of the new hay shed.

Around June 20 through June 23, 2003, after plaintiff had bailed its first 2003 cutting and before any problem with the hay was detected, severe storms moved through plaintiff's farm and the surrounding area.  Mr. Doyle Robison, described the rainfall as "more rainfall than we ever had on any of this hay through that period of time."  Mr. Doyle Robison testified he thought perhaps two inches of rain had fallen at the farm, but was not sure, and that twelve inches of rain had fallen five miles north of the farm, while a half inch of rain fell eight miles south. Mr. Delton Robison, who was away from the farm at the time of

the storms, affirmed that the farm had "never seen rainfall like this before[.]"  Specifically, he affirmed that during his years of farming he had "never seen that amount of rain in that short period of time[.]"

Generally, when a big storm hits Robison Farms plaintiff provides no additional protection for its baled hay because it is "tarped and covered" already.  When the June storms passed through, plaintiff had already bailed its first cutting.  These bails were not, for the most part,  in a storage shed, but rather were "stacked outside and tarped."  The winds from the storms blew off half of the one shed plaintiff had stored hay in.  This shed was only half full of hay, but the hay was not covered with tarps.  After the storm there was standing water in at least some of plaintiff's fields.  Specifically, Mr. Doyle Robison testified that part of the property on the farm flooded and standing water was under one stack of plaintiff's hay.  After the storms, neither Doyle or Delton took any of  bails of hay apart to look for mold, but Doyle did replace two or three tarps covering the hay.

On its 2003 first cutting, plaintiff claims to have applied six pounds per ton on hay at the 0-15% moisture range; 12 pounds per ton at the 15-19% moisture range; and 14 pounds per ton at 19-22% moisture range.  Plaintiff and its experts agree that if its hay actually had moisture content of less than 15%, it would have stayed in good condition without any hay preservative but plaintiff applied the Super Hay preservative out of caution.  However, plaintiff claims that over 1,000 bales with a supposed moisture content of less than 15% went out of condition.  Plaintiff brought in a bale from this first 2003 cutting to Mr. Larson, who described a "white mold on the hay."

> **b.**     **Plaintiff's 2003 second cutting**

Plaintiff asserts that the only farming practice it changed from plaintiff's first cutting in 2003 to the second cutting was terminating its use of Super Hay as soon as plaintiff noticed the mold in the hay.  Plaintiff did not bale its hay with any preservative until its order for a different hay preserver arrived

sometime after the second cutting.  Plaintiff did not have any mold problems and did not receive any customer complaints with its 2003 second cutting. Plaintiff returned to using the Harvest Tec product for the remainder of 2003 and subsequent years, and continues to use the same production techniques without having any further problems.

**4.      Changes to Super Hay label during plaintiff's use of the product**

During 2002 and 2003 when plaintiff used the Super Hay product, the label changed three times with each label increasing the recommended amount of Super Hay to be applied.  However, it is uncontroverted that all claims asserted in this lawsuit arise out of plaintiff's use of Super Hay on its 2003 first cutting, and that during this period only one product label, Label 3, was in use.

The first label given to plaintiff in 2002 required an application rate of four pounds of product per ton for a moisture content of 17-21 percent and six pounds of product per ton to be applied for a moisture content of 22-25 percent. The second label required 5-7 pounds of product per ton be applied on large square bales with a moisture content of 17-21 percent, and 7-12 pounds of product per ton be applied on large square bales with a moisture content of 22-25 percent.   Moreover, an additional three pounds per ton should be applied for first cutting or rained-on hay.  Label 2 also has management tips for baled hay, stating that hay should not be baled at a greater than 30 percent moisture.

Label 3 was the label on the Super Hay product used by plaintiff when it applied Super Hay to its first 2003 cutting.  Label 3 adds more detail for usage instructions and divides the moisture percent into six percentage categories: 12-18 percent (requires five pounds per ton); 19-21 percent (requires six pounds per ton); 22-23 percent (requires nine pounds per ton); 24-25 percent (requires 12 pounds per ton) – rather than two categories for Label 1 and four categories for Label 2.   Label 3 distinguishes between the bale sizes and requires an additional 2 pounds per ton for 4' x 4' square bales (the first time the label addresses

4' x 4' bales).  Label 3 requires that three pounds per ton be added to the first and fourth cutting or rained-on hay, and lists management tips for baled hay.  Plus, for the first time, the label states that treated bales should not be stored directly on dirt.[54]

Plaintiff claims it was told at the time it had problems in 2002 with Super Hay that the label should have printed that first and fourth cuttings should have additional poundage added to it.  Label 3, the label on the Super Hay product plaintiff used on its first cutting, contains a notation to this effect. Plaintiff did not receive any documents or papers that contradicted the Super Hay Label 3 and defendants did not make any oral representations or statements to Robison Farms which were contrary to the instructions or application rates specified on the Super Hay label.

### 5.    Molasses or sugar-like substance

On August 13 or 14, 2003 an employee of defendant AGresearch created an internal memo regarding the return of the Super Hay product from plaintiff's storage facility at its farm.  This memo noted a bulk truckload was received from "NCK/ Robison farms."  This memo also indicated that a hose attached to the tanker truck returning the product "was found to be contaminated with what looked like molasses" and that "[f]urther inspection revealed that the 3" nipple elbow and male hose coupler, and from the outbound valve forward was also contaminated with molasses."  The memo also provided that the "[l]argest amount of contaminate was found in product from NCK Feeds" and that at the Robison's farm "hoses were laying on the ground with no end caps as well.  A sample was taken from the bottom of the compartment and it contained what appeared to be asphalt, dirt, and rocks.  A sample taken from load is

---

[54] Plaintiff also contends that the court should consider another Super Hay label that came out after plaintiff's 2003 use of Super Hay.  *See* Response (Doc. 74) at (Exhibit 10).  Defendants argue, and the court agrees that this label, or " Label 4" would constitute an inadmissible "remedial measure" and is therefore inadmissible.  *See* Reply (Doc. 83) at p. 29; (citing Fed. R. Evid. § 407; *Meyerhoff v. Michelin Tire Corp.*, 852 F. Supp. 933, 941 (D. Kan. 1994)).

also being sent to Midwest Labs for analysis of organic acid level."[55]

Both Delton and Doyle Robison also testified to finding certain sugar-crystal like particles in their screens that filtered the Super Hay product.[56]

### 6.     Other potential causes

Plaintiff denies that rain storms in 2003 contributed to the hay spoilage because the hay bales, for the most part, were either stacked in a hay shed or on raised pads and covered by tarps so that little, if any, of the storm water and humidity reached the bales.  Plaintiff' contends that when the hay is put in a stack and tarped, it will likely not go out of condition due to rainfall.

However, Dr. Anderson, plaintiff's own expert,  agreed that "there may have been problems with [plaintiff's] hay stacking and storage procedures to cause th[e] amount of spoilage" that occurred and he had "concern" that a significant amount of rainfall could have contributed to plaintiff's  hay going out of condition.  Specifically, Dr. Anderson testified that "[m]oisture level is . . . the primary factor" other than a preservative that prevents microbial growth" found in mold.

Dr. Anderson also testified that plaintiff's hay could have gone out of condition because (1) its moisture estimate was incorrect; or (2) because plaintiff bailed its hay during a very humid time, the bails could have absorbed the humidity causing an increase in moisture and enhanced microbial activity.  In Dr. Anderson's opinion "the most likely explanation" for hay going out of condition is an incorrect moisture

---

[55]The subsequent lab test results reflected that the propionic acid level was at or above the 70% level as specified.  *See* Memorandum in Support (Doc. 71) at (Exhibit N).

[56]The court notes that Doyle and Delton Robison's deposition testimony about the impact of the Super Hay product at Bestifor Farms or Best Four Farms appears to stem only from their conversations with those at the neighboring farm, rather than their first-hand experience and observations.  As such, Doyle and Delton Robison's testimony as these matters amounts to inadmissible hearsay and will not be considered in the instant motion.  *See e.g.*, *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

reading.  Dr. Anderson also agreed that "a number of things . . . could have caused or contributed to the poor results" plaintiff had with its first cutting in 2003 and that "it's impossible to determine what factors specifically were causing the problem."  However, Dr. Anderson did not attempt to prioritize or rank any of the possible causes as why the hay went out of condition.

### C.    Discussion

As discussed below, the court finds summary judgment warranted as to all of plaintiff's claims.

### 1.    The parties' contentions

Defendants chiefly argue that summary judgment is appropriate as to all of plaintiff's claims because plaintiff cannot prove any defect in the Super Hay product as required by the Kansas Product Liability Act ("KPLA").  As to the contract claim, defendants also contend that the Super Hay label and invoices amount to the final agreement between the parties such that the court cannot consider parole evidence regarding the April 2003 discussion between the parties.

Plaintiff asserts that is can prove a defect in the Super Hay product because:

 (1) the product labels were changed during the relevant time period indicating that the Defendants had knowledge the product was failing to perform adequately; (2) the Defendants' quality control system lacked adequate safeguards and records to prove the product used was not contaminated; (3) the Super Hay product did not work for the Plaintiff; (4) no other reasonable excuse exist for the damages suffered by plaintiff; and (5) expert testimony that a sugar-based contaminant in the product likely affected its performance.[57]

 Plaintiff agrees that the Kansas Product Liability Act applies to its  negligence and warranties claims, but not to its breach of contract claim.  Additionally, plaintiff contends that the April 2003 meeting between the parties established the terms and conditions of the parties' contract.[58]

---

[57] Plaintiff's Response (Doc. 74) at p. 32.

[58] *Id.* at 41.

2.      **Standard**

The Kansas Product Liability Act ("KPLA")[59] applies to all product liability claims regardless of substantive theory of recovery.[60] Specifically, section 60-3302(c) of the KPLA defines a "product liability claim" as:

> any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any action based on, strict liability in tort, negligence, breach of express or implied warranty, breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent, misrepresentation, concealment or nondisclosure, whether negligent or innocent, or under any other substantive legal theory.[61]

The KPLA further defines "[h]arm" as including "[d]amage to property [.]"[62]

Kansas recognizes three means by which a product may be defective: (1) a manufacturing defect, (2) a warning defect or (3) a design defect.[63] To establish a *prima facie* product liability case under any of these theories, plaintiff must prove: (1) the injury resulted from a condition of the product and (2) the condition existed at the time it left the defendant's control.[64] Under the KPLA, all legal theories of recovery, including negligence, strict liability, and failure to warn, are merged into one legal theory called

---

[59]K.S.A. 60-3301 et. seq.

[60]*See Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 126, 795 P.3d 915, 931 (1990).

[61]K.S.A. 60-3302(c).

[62]K.S.A. 60-3302(d).

[63]*See Delaney v. Deere & Co.*, 268 Kan. 769, 774, 999 P.2d 930, 936 (2000).

[64]*See e.g.*, *Jenkins v. Amchem Prods., Inc.* 256 Kan. 602, 630, 886 P.2d 869, 886 (1994); Pretrial Order (Doc. 67) at p. 6.

a "product liability claim."[65]   As a result, the provisions of the KPLA "apply to actions based on strict liability in tort as well as negligence, breach of express or implied warranty, and breach of or failure to discharge a duty to warn or instruct."[66]

"General assertions regarding a product's alleged defective nature are insufficient; instead Kansas law requires plaintiff to establish the existence of a specific defect to prevail on a defective product claim."[67]   The elements of a product liability claim "may be proven inferentially, by either direct or circumstantial evidence."[68]   When a plaintiff relies on circumstantial evidence of defect, such evidence "must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective."[69]   The cause of the harm is that "which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.'   Proof of injury during use of the product, without more, is insufficient to establish that a defect in the product caused the injury."[70]

In *Wilcheck v. Doonan Truck Equipment, Inc.*, the Kansas Supreme Court provided that "[r]egardless of the theory upon which recovery is sought for injury in a products liability case, proof that

---

[65]*Workman v. AB Electrolux Corp.*, No. 03-4195-JAR, 2005 U.S. Dist. LEXIS 16306 at * 41 (D. Kan. Aug. 8, 2005)(citing *McCroy v. Coastal Mart, Inc.*, 207 F. Supp. 1265, 1270 (D. Kan. 2002)(citing *Savina*, 247 Kan. at 126)).

[66]*Id.*

[67]*Id.* at *43 (citing *Jenkins v. Amchem Prods.*, 256 Kan. 602, 630, 886 P.2d 886 (1994)).  *See also McCoy v. Whirlpool Corp.*, 379 F. Supp. 2d 1187, 1202 (D. Kan. 2005).

[68]*McCoy v. Whirlpool Corp.*, 379 F. Supp. 2d 1187, 1202 (D. Kan. 2005)(citing *Mays v. CIBA-Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348, 360 (1983)).

[69]*Id.* (citing *Mays*, 233 Kan. at 54).

[70]*Voelkel v. General Motors Corp.*, 846 F. Supp. 1468, 1475 (D. Kan. 1994)(citing *Wilcheck*, 220 Kan. at 235-36).

a defect in the product caused the injury is a prerequisite to recovery.  In order to recover in a product liability action, the defective product must be the actual and proximate cause of the injury [.]"[71]

However, in *Cantrell v. Amarillo v. Hardware Co.*, the Kansas Supreme Court explained its holding in *Wilcheck*, noting:

> [a] manufacturer may by express warranty assume responsibility in connection with its products which extends beyond liability for defects.  All express warranties must be reasonably construed taking into consideration the nature of the product, the situation of the parties, and surrounding circumstances.  However, defects in the product may be immaterial if the manufacturer warrants that a production will perform in a certain manner and the product fails to perform in that manner.  Defects may be material in providing breach of an express warranty, but the approach to liability is the failure of the product to operate or perform in the manner warranted by the manufacturer.[72]

The court further explained that as to express warranties

> the burden of proof resting upon the plaintiff entails merely demonstration that the goods did not have the properties warranted.  In the absence of controverting evidence adduced by the defendant, which convinces the jury that the goods were as warranted, plaintiff should prevail. The plaintiff is not required to show the technical causation of the goods' failure to match their warranty.  Nor is it necessary that the manufacturer's negligence be shown as the cause of such failure.[73]

Because "the plaintiff's burden on the express warranty claim is not to prove a specific defect," the court will discuss it hereafter.[74]

---

[71]220 Kan. 230, 235, 552 P.2d 938, 942 (Kan. 1976).  *See also Miller v. Lee Apparel Co.*, 19 Kan. App. 2d 1015, 1032, 881 P.2d 576, 576 (1994)(citing this rule in *Wilcheck*); *Messer v. Amway Corp.*, 106 Fed. Appx. 678, 685 n. 4 (10th Cir. 2004)(same); *Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095, 1125 (D. Kan. 2002)(same).

[72]226 Kan. 681, 685, 602 P.2d 1326 (Kan. 1979)(citing *Huebert v. Fed. Pac. Electric Co., Inc.*, 208 Kan. 720, 494 P.2d 1210 (Kan. 1972)).

[73]*Id.* (citations omitted).

[74]*See also Voelkel v. General Motors Corp.*, 846 F. Supp. 1468, 1476.

**D.     Proof of defect**

In the Pretrial Order plaintiff lists its claims as: (1) the acts and failures of defendants constituted negligence in the "application instructions" and "performance of the Super Hay product"; (2) breach of K.S.A. 84-2-313, K.S.A. 84-2-315, and K.S.A. 84-315, "inasmuch as Super Hay did not perform adequately according to its label and/or according to the additional assurances and instructions given by the defendants"; (3) "[t]he acts and failures of acts by the defendants constitute a breach of contract under the laws of the State of Kansas[.]"[75] Specifically, plaintiff claims that it can prove negligent misrepresentation and breach of various warranties because of a "defect in design, manufacturing, instructions, or warning."[76]

Plaintiff's response to the instant motion is devoid of any reference as to what type of product liability claim it seeks to bring, whether defect in design, manufacturing, or warning.  However, plaintiff contends it can demonstrate some sort of defect in the Super Hay product because:

> (1) the product labels were changed during the relevant time period indicating that the Defendants had knowledge the product was failing to perform adequately; (2) the Defendants' quality control system lacked adequate safeguards and records to prove the product used was not contaminated; (3) the Super Hay product did not work for the Plaintiff; (4) no other reasonable excuse exist for the damages suffered by plaintiff; and (5) expert testimony that a sugar-based contaminant in the product likely affected its performance.[77]

Defendants have described plaintiff's evidence of product defect as "circumstantial"[78] a characterization plaintiff has not refuted.[79]  "For circumstantial evidence to make out a *prima facie* case,

---

[75] Pretrial Order (Doc. 67) at p. 5-6.

[76]*Id.* at 6.

[77] Plaintiff's Response (Doc. 74) at p. 32.

[78]*See e.g.*, Memorandum in Support of Motion (Doc. 71) at p. 20-21; Reply (Doc. 83) at p. 25.

[79]*See* Plaintiff's Response (Doc. 74) at 38(discussing circumstantial evidence).

it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective.  Because liability in a products liability action cannot be based on mere speculation, guess, or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility."[80]

### 1.     No expert testimony exists indicating a defect in Super Hay

Here, the court has already excluded the expert testimony of Dr. Plashko and plaintiff has offered no other expert testimony as to any defect of the Super Hay product either in design, manufacture, or warning.  Moreover, Dr. Anderson, another of plaintiff's experts, affirmed that he had "no specific information that there was anything wrong with the hay preservative that either caused or contributed to cause any of this hay to go out of condition."[81] Plaintiff does not dispute defendants' characterization that because the facts are alien in terminology and involve technical complexities that go "beyond the experience and understanding of the average layman"[82], expert testimony is necessary to prove a defect in the instant case.  Specifically, the court finds that reasonably inferring that or how a molasses-like substance reacted with the Super Hay product so as to contaminate it goes beyond the average layperson's experience and understanding.

### 2.     Plaintiff's circumstantial evidence does not negate the other reasonable causes for the spoilage of plaintiff's hay

The court also finds that plaintiff's circumstantial evidence fails to negate other reasonable causes such that an inference of a *probability* of a defect, rather than a mere *possibility*, exists.

---

[80]*Dieker v. Case Corp.*, 276 Kan. 141, 161, 73 P.3d 133, 147 (Kan. 2003)(citing *Mays*, 233 Kan. at 54).

[81]Memorandum in Support of Motion (Doc. 71) (Exhibit F) at p. 145.

[82]*Trunk Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1215 (10th Cir. 2004).  *See* Memorandum in Support of Motion (Doc. 71) at p. 20; Reply (Doc. 83) at p. 26 n. 4.

### a.      Other reasonable causes

Dr. Anderson, plaintiff's own expert, agreed that "a *number* of things . . . could have caused or contributed to the poor results" plaintiff had with its first cutting in 2003 and that "it's *impossible* to determine what factors specifically were causing the problem."[83]   Indeed, Dr. Anderson did not attempt to prioritize or rank *any* of the possible causes for why the hay went out of condition.[84]

### i.      Increased moisture and plaintiff's haying practices

When the June 2003 storms hit, plaintiff's bails were not in storing sheds, but rather were "stacked outside and tarped."[85]   During plaintiff's first cutting in 2003 it experienced "more rainfall than [it] had on any of this hay through that period of time."[86]   Indeed, Mr. Delton Robison had "never seen rainfall like this before" and during his years of farming he had "never seen that amount of rain in that short period of time[.]"[87] As to the one shed containing plaintiff's bailed, but not tarped hay, half the shed blew away during one of the storms.  After the storm there was standing water in at least some of plaintiff's fields and part of the property had flooded such that standing water was under the one stack of plaintiff's hay.  After the storms, neither Doyle nor Delton took any of bails of hay apart to look for mold, but Doyle did replace two or three tarps that had been covering the hay.[88]

As to the rainfall, Dr. Anderson  agreed that "there may have been problems with [plaintiff's] hay

---

[83] Memorandum in Support of Motion (Doc. 71)at (Exhibit F) p. 118-119(emphasis added).

[84]*Id.* at (Exhibit F) p. 119-120.

[85]*Id.* at (Exhibit K) p. 68.

[86]*Id.* at (Exhibit K) p. 159.

[87]*Id.* at (Exhibit I) p. 205.

[88] *Id.* at (Exhibit K) p. 69, 70, 159.

stacking and storage procedures to cause th[e] amount of spoilage" that occurred[89] such that he had concern that a significant amount of rainfall could have caused plaintiff's hay to go out of condition.[90] Specifically, Dr. Anderson testified, other than a hay preserver, a lower "[m]oisture level is . . . the primary factor" that prevents microbial growth found in mold.[91]

### ii.     Incorrect reading from moisture reader

Dr. Anderson also testified that plaintiff's hay could have gone out of condition because its moisture estimate was incorrect and in his opinion "the most likely explanation" for hay going out of condition is an incorrect moisture reading.[92]

### iii.     Humidity

Dr. Anderson also testified that plaintiff's hay was bailed in a very humid climate and the bails could have absorbed this humidity causing an increase in moisture and enhanced microbial activity.[93]

### b.     Plaintiff's circumstantial evidence does not indicate a probability of a defect in Super Hay or negate the other reasonable causes for plaintiff's harm

As to the label changes, plaintiff contends "[a] reasonable person can infer that Defendants were well aware of the fact that its Super Hay product did not perform to any adequate standards; otherwise, they would not have changed the usage amounts and instructions so often in such a short period of time."[94] The court finds the first and second Label referenced by plaintiff irrelevant because they correspond to hay

---

[89]*Id.* at (Exhibit F) p. 118.

[90]*Id.* at (Exhibit F) p. 68.

[91]*Id.* at (Exhibit F) p. 76.

[92]*Id.* at (Exhibit F) p. 80.

[93]*Id.*

[94]Plaintiff's Response (Doc. 74) at p. 37.

preservative manufactured and sold during 2002, while plaintiff brings its claim regarding Super Hay produced and used in 2003.  Moreover, plaintiff admits that it did not receive or rely upon any writing that contradicts the third Label, and as such the first two labels could not have been the actual or proximate cause of any damage suffered by plaintiff.  So too, plaintiff has failed to indicate how it relied on the third label such that it incorrectly applied the Super Hay product.  Nor, does the court find these Labels indicative of a design defect in the Super Hay product, especially considering the chemical makeup of the Super Hay did not change during this time.

The court agrees with Dr. Anderson, plaintiff's expert, that "because there are so many other factors that could influence" why plaintiff's hay went out of condition "to eliminate those other factors is also an impossibility."[95]  Accordingly, because plaintiff cannot meet its burden as to a specific defect, the court finds summary judgment warranted on plaintiff's negligence claim and claims for breach of implied warranty of merchantability and implied warranty of fitness for particular purpose.

### E.    Plaintiff's breach of contract claim falls within the ambit of the KPLA

Plaintiff claims that during its April 2003 meeting with defendant's representatives, they made certain promises, namely, if the 2003 hay went out of condition, ADM would "make up the difference between the diary hay price and the grinding hay price."[96]  To that end, plaintiff asserts that its breach of contract claim does not require plaintiff to prove a specific defect.  Putting aside certain evidentiary issues related to a contract between the parties, including whether the court could consider the April 2003 meeting as defining the terms of the contract, the court finds that the KPLA applies to plaintiff's claim for breach of contract.

---

[95]Memorandum in Support of Motion (Doc. 71)at (Exhibit F) p. 144-45.

[96]Plaintiff's Response (Doc. 74) at p. 42.

While the court is mindful that the KPLA should not be interpreted so as to "subsume even the most basic contractual dispute . . . .",[97] plaintiff has offered no reason as to why the KPLA does not apply to its claim for breach of contract.  Plaintiff asserts its contract with defendants "promised Super Hay would work in [plaintiff's] particular haying operation, and that the Defendants would cover the damages if the product did not work."[98]  This, as far as the court can tell, is the same factual basis as plaintiff's breach of express warranty claim.

A breach of contract claim may be precluded for redundancy when it mirrors that of the breach of warranty claims.[99]  In *Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc*., the court found that plaintiff's breach of warranty claims in a product liability case subsumed its general breach of contract claim. Specifically, the court found that because plaintiff "ma[de] allegations identical to those embodied in its breach of warranty claims" and "ha[d] not put forth evidence from which a reasonable inference could be drawn that its breach of contract claim is factually distinct from its breach of warranty claims, the court conclude[d] the plaintiff is precluded from asserting its generic breach of contract claim as a matter of law."[100]  The court finds the analysis in *Lohmann* especially applicable to the instant case because in both, "the suit is close to trial, and [the plaintiff] offers no argument that the breach of contract claim [was]

---

[97]*Gonzalez v. PepsiCo, Inc*., 489 F. Supp. 2d 1233, 1242 (D. Kan. 2007)(declining to following "[d]efendants' interpretation of the KPLA" as it would "subsume even the most basic contractual dispute arising out of a non-conforming tender of goods, barring such claims and functionally rendering the UCC and accompanying contract meaningless.").

[98]Plaintiff's Memorandum in Opposition (Doc. 74) at p. 32. The Pretrial Order lists  "[w]hether the plaintiff's breach of contract claim fails as a matter of law because the plaintiff cannot prove the Super Hay was defective or deficient in any way" as a "significant legal . . . issue[] that will need to be resolved[.]" Pretrial Order (Doc. 67) at p. 8.

[99] *Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1152-53 (D. Kan. 2007).

[100]*Id.* at 1153.

32

somehow factually distinct from the breach of warranty claims."[101]

Moreover, the court finds guidance from the KPLA itself in that plaintiff's *particular* "breach of contract" claim is really a claim for breach of express warranty.  K.S.A. 60-3302(c) defines a "product liability claim" as

> *any* claim or action brought *for harm caused* by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any action based on, strict liability in tort, negligence, breach of *express* or implied *warranty*, breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent, *misrepresentation*, concealment or nondisclosure, whether negligent or innocent, or under *any other* substantive legal theory.[102]

Here, plaintiff is bringing a claim titled "breach of contract" stemming from harm caused by an alleged defect in the Super Hay product–a product that plaintiff alleges defendants expressly warranted would work.  Under the circumstances of this case, the court finds plaintiff's breach of contract claim identical to its claim for breach of express warranty–a claim plaintiff does not dispute falls under the ambit of the KPLA.  Accordingly, plaintiff is precluded from asserting its generic breach of contract claim as a matter of law.

### F.   Breach of Express Warranty (K.S.A. 84-2-313)

Plaintiff bases its breach of express warranty claim on what it contends defendants' representatives said during an April 2003 meeting.  Mr. Doyle Robison testified as follows regarding this meeting:

> Q:   Okay.  You had said that at the spring 2003 meeting someone had guaranteed the performance of the Super Hay product?
> A:   Yes.
> Q:   Who was that?
> A:   Mark Stevens.

---

[101] *Lohmann*, 477 F. Supp. 2d at 1152-53  (quoting *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 982-83) (E.D. Wis. 1999).

[102] K.S.A. 60-3302(c)(emphasis added).

Q:     And what exactly---

A:     And he was assured by Kim Johnson that it would work.  And Mark Stevens guaranteed us it would work.  Because we weren't going to use the product unless they guaranteed it would work for us, because what it did to us in 2002.  We were going to go back to Harvest Tec at that time.

Q:     What exactly did Mark Stevens say that you thought was a guarantee of its performance?

A:     That if the product failed, which it did, that they would make the difference between our dairy hay and our grinding hay on our losses, and we would stop the product at the time, they would come out and pick up the rest of the product that was in our tanks, and we were not going to pay for the product that had been used, because if it didn't work, we wasn't going to pay for it.

Q:     And when—when—there was a reference to the product failing, what did that mean?  What did it mean when it—that the product failed?

A:     If the hay went out of condition.

Q:     If any hay at all did?

A:     That's right.

Q:     So if any hay at all went out of condition, they were going to take back the product and then compensate Robison Farms for any prices below dairy quality?

A:     That's correct.

Q:     And that was Mark Stevens that said that?

A:     Yes, it was.  And it was assured by Kim Johnson to him that the product would work at their new rates.

Q:     Did Kim Johnson say that in front of you to Mark Stevens?

A:     That he assured him that it would work?  Yes in front of all five of us. [103]

….

A:     And our stacking procedure was all discussed with both representatives of AgResearch, Kim Johnson, and Mark Stevens on how we stack our hay and they told us we—they guaranteed us that there would be not problem with that.  And that is an industry standard, that type of stacking.[104]

1.     **Standard**

Under an express warranty claim, the plaintiff is not required to prove that a specific defect existed when the product left defendant's control.[105]  However, "plaintiff must nevertheless show that the product

---

[103]Memorandum in Support (Doc. 71) at (Exhibit K) p. 30-32.

[104] *Id.* at (Exhibit K) p. 52.

[105]*Voelkel v. General Motors Corp.*, 846 F. Supp. 1468, 1477-78 (D. Kan. 1994).

failed to perform as expressly warranted and that this breach of warranty *caused* his injury."[106]  The cause of the harm "is that which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.'  Proof of injury during use of the product, without more, is insufficient to establish that a defect in the product caused the injury."[107]

In *Allendbrand v. Louisville Ladder Group*, the court held that because plaintiff relied solely on the opinion of an expert to prove causation, an expert whose testimony the court had excluded, "plaintiff had no admissible evidence on the issue of causation" and "[b]ecause plaintiff ha[d] not presented admissible evidence that [defendant's] breach of an express warranty caused plaintiff's injuries" the court sustained defendant's summary judgment motion.[108]  In *Voelkel v. General Motors Corp.*, defendant expressly warranted that its seatbelts were "trouble-free, safe, of superior craftsmanship, built and manufactured with high quality materials and workmanship."[109]  The court denied defendant's motion for summary judgment as to plaintiff's express warranty claim because admissible *expert* testimony existed indicating plaintiff had suffered enhanced injuries *caused* because his seatbelt buckle failed to latch or unlatched on impact.[110]

--------

[106]*Allendbrand v. Louisville Ladder Group*, No. 05-2511-KVH, 2007 U.S. Dist. LEXIS 2401 at *11 (D. Kan. Jan. 11, 2007)(citing *Voelkel v. General Motors Corp.*, 846 F. Supp. at 1477-78) (citing *Cantrell*, 226 Kan. at 685))(emphasis added).

[107]*Voelkel v. General Motors Corp.*, 846 F. Supp. 1468, 1475 (D. Kan. 1994)(citing *Wilcheck*, 220 Kan. at 235-36).

[108]*Allendbrand*, 2007 U.S. Dist. LEXIS 2401 at *11-12.

[109]846 F. Supp. at 1478.

[110]*Id.* at 1480.

2.      **Analysis**

As in both *Allendbrand* and *Voelkel*, aside from Dr. Plashko's expert testimony, plaintiff has offered no proof as to causation of the harm it suffered,  i.e., that the Super Hay product caused the damage to plaintiff's hay.  While the court does not believe every claim for a breach of express warranty in a product liability case requires an expert to testify as to causation, the court finds that, in the instant case, the facts involve such technical complexities that they exceed "the experience and understanding of the average layman"[111] such that without the aid of expert testimony, a reasonable trier of fact could not determine the *cause* of the harm to plaintiff's hay.

Moreover, plaintiff's circumstantial evidence is also insufficient to demonstrate that defendants' product *caused* plaintiff's hay to go out of condition.  Plaintiff's haying practices, and moisture from either humidity during bailing or the severe rains, a failure of the moisture reader, or "a number of factors"[112] other than a breach of the warranty could reasonably have caused the damage to plaintiff's hay. Accordingly, the court finds summary judgment warranted on plaintiff's claim for breach of express warranty.

Accordingly,

IT IS THEREFORE ORDERED that defendants' Joint Motion to Exclude the Opinions and Testimony of Plaintiff's Expert Bruce E. Plashko, PhD Relating to Possible Product Contamination (Doc. 68) is granted.

IT IS FURTHER ORDERED that defendants' Motion for Summary Judgment (Doc. 69) is granted.

---

[111]*Trunk Ins. Exch. v. MagneTek, Inc*., 360 F.3d 1206, 1215 (10th Cir. 2004).

[112]Memorandum in Support of Motion (Doc. 71) at (Exhibit F) p. 119.

IT IS SO ORDERED.

Dated this 29th day of September 2007, at Topeka, Kansas.

                                           __ s/ K. Gary Sebelius __
                                           *K. Gary Sebelius*
                                           U.S. Magistrate Judge